INDEPENDENCE FUND OF NORTH AMERICA, INC., Appellant, v.
MRS. ALEX MILLER, Secretary of State et al., Appellees.

No. 44305.

1102 

MAY 9, 1939.

REHEARING DENIED SEPTEMBER 22, 1939.

 ▄▄ 

Stipp, Perry, Bannister & Starzinger and Bippus, Rose, Burt & Pierce, for appellant.

Fred D. Everett, Attorney General, for appellees.

OLIVER, J.—This is an appeal from a decree of the district court affirming and sustaining the action of the Secretary of State, as the head of the Securities Department of Iowa, of date September 10, 1936, denying the application of appellant, Independence Fund of North America, Inc., for the registration of and for Issuer-Dealer's License for $60,000 Independence Fund Declarations of Trust and Agreements. Appellant, a New York corporation, since its organization in 1930, has been engaged in the business of sponsoring, issuing and selling its securities which were severally known as Participation Agreements, Trust Certificates, Declarations of Trust, and Declarations of Trust and Agreements, some of which were subdivided into other classifications. At various times from 1930 to 1935 certain of these securities were sold in Iowa under permits issued by the department. Some of these permits were thereafter revoked and other applications for registration denied, controversies ensued, and the various transactions and complications concerning said matters were so numerous and extended that space does not permit detailing the same. Appeals in four separate cases involving different securities and controversies are inter-

mingled in this record and had it not been for the fairness of counsel on both sides in assisting us by differentiating and explaining various elements of the mass of evidence and record submitted, the task of unraveling the same would have been difficult and burdensome.

On July 8, 1935, appellant applied for the registration of the $60,000 Independence Fund Declarations of Trust and Agreements in controversy herein. At that time the permits to sell certain other of appellant's issues had been suspended by the department.

These Declarations of Trust and Agreements were set up in blocks of $1,200 or other amounts as follows: The buyer was called the Founder, a New York Trust Company was the Trustee, and appellant was called the Company. On a $1,200 principal amount the Founder agreed to pay the Trustee $10 per month for 10 years to cover principal, a Trustee's fee of 30¢ per month during the life of the agreement and a federal issuance tax of $1.20. The Founder also agreed to pay the Company a creation fee of $10 per month for 9 months, a management fee of 50¢ per month during the life of the agreement and an optional charge for reducing term life insurance protecting future payments, which charge was $8.17 for the first year and totaled $42.84 for the ten-year period. As the Trustee received these payments, the $10 principal amounts were invested by it with similar funds in an undivided interest in stocks and bonds, thus giving the Founder an undivided share in a trust fund composed of various securities which were to be purchased at market price and held by the Trustee. The Company supervised and handled these purchases from an agreed list and the management fee was for this service. The Founder could terminate the agreement at any time and receive the market value, at said time, for his share of the securities so held. Hence, if such market value was the same as it had been at the time of purchase, the Founder would be returned that part of his money which represented principal payments plus earnings, if any, but not including payments for creation fee, management and trustee fees and transfer taxes. At anytime when the Founder was one year in arrears the Company might require the Trustee to so terminate the agreement. The trust was known as the accumulative type under which all earnings were to be retained by the Trustee until its termination, which was to occur when

the value of the Founder's investment reached a certain amount and in any event at the end of 50 years.

With its application of July 8, 1935, appellant furnished the department certain information and data. On July 26, 1935, the department demanded additional information which was thereafter furnished by appellant only in part. Later, upon suggestion of the department, a hearing was held November 22, 1935. Discussed at this hearing, among other things, was the question of the applicability of certain statutes to the transaction in question and the department expected to secure a legal opinion thereon. On May 7, 1936, the department having theretofore made no decision upon the application of July 8, 1935, an order of court was secured requiring it to rule. On May 9, 1936, and by amendment on September 10, 1936, the department made its ruling denying the application. Appeal to the district court resulted in an affirmance of said ruling, hence this appeal.

The authority of the Secretary of State and the Securities Department under his supervision is conferred by chapter 393-C1, Code of Iowa 1935, known as Iowa Securities Act. Its purpose, in part recited in the preamble, was to protect investors by regulating the sales of securities, fixing the scope of such regulations and conditions under which securities might be sold, and providing for enforcement of the act through the agency of the Secretary of State and the Securities Department.

An examination of the statute discloses that it seeks to attain its end by regulating and licensing the issuer and dealer and inspecting and licensing the security. In scope it differs from the acts of Pennsylvania and certain other states which license the dealer without requiring the qualification of the security and from the statutes of other jurisdictions some of which require only that the security be qualified and still others which are based solely upon fraud and require no qualification for either dealer or security.

The act embraces and regulates a broad field of varied security transactions. Therefore, it becomes immediately apparent that for it to prescribe in detail the rules and regulations essential for the attainment of its purposes in each case would be a practical impossibility. Of necessity the legislature was compelled to delegate to the Secretary of State, in his handling of the details of the regulation and enforcement of the act, discretion comparable to the complexities of the situations it was de-

signed to remedy. Otherwise in this and other similar situations such legislation would be rendered practically impotent. State v. Van Trump, 224 Iowa 504, 506, 275 N. W. 569, 570, discusses the validity of and the proper construction to be given to such enactments and refers to various supporting authorities which we will not attempt to cite herein. In that case Justice Mitchell, speaking for the court, said:

"The legislature may not delegate its purely legislative power. The courts thruout the land have held this. Nevertheless, it has been recognized from the very earliest times that this does not prevent the legislature from invoking the aid of other governmental departments in effectuating its policies. This court has endeavored, within constitutional limits, to pursue a 'common sense' policy in determining the extent to which delegation may be permitted, and to give due consideration to the necessities of governmental coordination and the practical difficulty of adapting legislation to complex conditions involving a host of detail. * * *

"No government, embodying the principles of the separation of power, could function if the legislature were prohibited from conferring power or authority of any character upon executive or administrative officials. * * *

"When the legislature declares a general rule and prescribes the circumstances under which it shall apply but in such general terms as to require that authority be delegated to others 'to fill up the details' by rule or regulation, the weight of authority is that the 'strictly and exclusively legislative' power has not been delegated. When the legislature lays down an intelligible and complete declaration of policy which is definite in describing the subject to which it relates or to the field wherein it shall apply, and the character of regulation which is intended to be imposed, it is proper to leave to a nonlegislative body the manner in which that general policy shall apply to varying situations."

That the legislature intended to and did delegate to the Secretary of State authority and direction "to fill up the details" is evident from various provisions of the act. Among other things Code section 8581-c8 provides:

"The secretary of state shall have power to place such

conditions, limitations and restrictions on any registration as may be necessary to carry out the purposes of this chapter.''

Therefore, the Secretary of State was legally invested with discretionary power to make and enforce such reasonable rules and regulations compatible with the provisions of the Securities Act as might be necessary to properly administer the same. Having disposed of the foregoing general legal propositions, we will now proceed to the consideration of some of the specific reasons given by the department for its ruling denying the application of appellant.

■ I. The first basis given for the ruling of the department was that the affairs of appellant ''are in an unsound condition''. Without discussing in detail the various financial statements and other evidence bearing upon this phase of the case, we may say that we do not agree with the correctness of this finding. Although appellant had incurred substantial operating deficits and there is evidence that it had also sustained losses in a certain affiliated enterprise and in unpaid obligations of some of its officers, it appears that by changes in its capital structure sufficient additional capital had been secured that the concern was apparently sound and solvent.

However, the reason for our holding upon this point is not founded primarily upon the financial position of appellant. The Company was not proposing to dispose of an issue based upon its own capital or assets, or having any relation thereto. Its principal responsibility was the investment management of a trust, the assets of which were in the possession of a third party trustee. Therefore, its financial status was not of the outstanding importance as though it had been proposing to dispose of a capital issue of its own. The Founder looked to appellant for management only and the trust indenture furnished protection upon this point by providing the means for securing and compensating a successor manager in case the necessity for such arose. Keeping in mind the primary purpose of the act, to wit, the protection of investors, we think there was no such showing of financial unsoundness as would, under the circumstances of this case, justify the refusal of an issuer-dealer's license.

■ II. Another reason given for denying the application was that appellant proposed to violate the insurance laws in connection with the sale of said securities. Under the Declara-

tions of Trust and Agreements, at the option and expense of the Founder, appellant agreed to procure group insurance upon his life to cover the unpaid balance of his contract. Appellant had arranged with an out-of-state insurance company to have these policies written, payable to and held by the Trustee, premiums to be charged to each Founder who was so insured. The request of any Founder for insurance, together with answers to interrogatories concerning his health, etc., was taken at the same time the Founder signed the Agreement and Request for Declaration of Trust, and was a part thereof. .

Section 9119 Code of Iowa 1935 provides: .

"No person shall directly or indirectly, act within this state, as agent, or otherwise, in receiving or procuring applications for insurance, * * * until he has procured from the commissioner of insurance a license authorizing him to act for such company or association as agent."

On July 26, 1935, the Secretary of State forwarded a list of questions to appellant, relating in part to this proposition. Appellant responded that its salesmen had not qualified as insurance agents for the reason that they were not selling insurance. Nor did appellant procure such license from the insurance department of Iowa.

It is urged that the proposed arrangement would not constitute conducting an insurance business within the state. Assuming, without deciding, that the insurance company, under the circumstances, would not have been conducting its business in Iowa, it is nevertheless clear that the contract contemplated the receiving or procuring in Iowa by appellant and its agents of applications for insurance. Therefore, appellant, in refusing to comply with the statute above quoted, did not propose to conduct its business in accordance with law and the Secretary of State properly refused its application for registration and issuer-dealer's license. Whether the contract would have violated other provisions of the insurance statutes need not be here determined.

■ III. On May 18, 1931, the Secretary of State ordered "that the loading charge on any investment trust shall not exceed 10% and this shall include all organization, trustees' fees and any and all fees during the life of the trust." That the proposed issue of Independence Fund Declarations of Trust

and Agreements would not comply with this order was one of the grounds for the refusal of registration. Appellant contends this order constituted unreasonable discrimination and was an attempted, unwarranted usurpation of legislative powers by the Secretary of State.

As heretofore noted, the purpose of the act was the protection of the investor. The Secretary of State was given authority to make rules and regulations necessary to carry out its purposes. Code section 8581-c8 directs the Secretary of State to find whether or not the sale of the security would be fraudulent or would work or tend to work a fraud upon the purchaser, or that the enterprise or business of the issuer is not based upon unsound business principles. Section 8581-c11 authorizes the Secretary of State to forbid the sale of any security when "in his opinion, the sale thereof would be unfair, unjust or inequitable to the purchaser thereof".

Although the latter provision appears in the section relating to registration of dealers and salesmen, it is plainly indicative of the legislative construction of the former. Under such construction the Secretary of State may refuse the registration of a security if, in his opinion, it is unfair, unjust or inequitable. It is not essential that it be "fraudulent" as this word is ordinarily defined. Since the Secretary of State is thus authorized to use his judgment it is quite proper that standards be established upon which to base such opinion and judgment. The order of May 18, 1931, represented the establishment of a standard fixing the limit of "loading charge" upon a security. Brady v. Mattern, 125 Iowa 158, 100 N. W. 358, 106 Am. St. Rep. 291.

Under the foregoing and other provisions of the chapter, we think the Secretary of State was amply authorized to make and enforce the order limiting the percentage of "load" upon securities of this character. The computations involved in arriving at the solution of this problem were made by a trained statistician and although the evidence upon that point is not without conflict, we do not think the order was unreasonable or arbitrary. Therefore, the department was justified in denying the application on the ground that the proposed loading charge was in excess of the limit fixed in the order.

IV. The appellant failed to furnish the Secretary of State certain information required in the order of August 21,

1935. This information related in part to the condition of the trust company which acted as Trustee. As we have already observed, appellant was not proposing to dispose of a capital issue of its own nor did the plan contemplate its holding the proceeds of the investor's funds. The trust assets were to be held by the Trustee. Due to this situation the financial stability of appellant was not regarded as of outstanding importance. By the same token the financial status of the Trustee was a subject of proper inquiry on the part of the Secretary of State. It will not be sufficient for appellant to say that it has selected a Trustee of unquestioned stability and, therefore, there is no need for investigation. The department was expected to become intimately acquainted with the situation, of its own personal knowledge, and would have been derelict in its duty if it assumed that the condition of a Trustee in a foreign state was such as to require no investigation.

However, it is contended that the Secretary of State, by failing to follow up and repeatedly demand the information required in the order of August 21, 1935, waived the right to object to the failure to furnish the same. With this contention we cannot agree. The requirement having been once made it was incumbent upon appellant either to comply or to secure its withdrawal.

In view of the foregoing it is unnecessary to decide other propositions discussed in the arguments. The district court properly affirmed the ruling and order of the Secretary of State. —Affirmed.

MITCHELL, C. J., and HAMILTON, SAGER, HALE, BLISS, MILLER, and STIGER, JJ., concur.

RICHARDS, J., concurs in result.